# LOUIS COMI *v.* STATE OF MARYLAND

[No. 898, September Term, 1974.]

*Decided June 3, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*Alexander R. Martick,* with whom was *Isaac S. Kershner* on the brief, for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Stephen Tully, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Louis Comi was tried before a jury in the Criminal Court of Baltimore on indictments and informations charging fourteen counts of receiving stolen goods. He was convicted on all but one count, upon which the jury returned a not guilty verdict. Judge Robert Karwacki imposed a ten year sentence on each of the thirteen counts of which Mr. Comi was found guilty, but permitted each to be served concurrently, thus permitting appellant to serve 130 years while immured but for ten.

Appellant assigns error in the denial of his motion for separate trials, the denial of a mistrial following an "in-

flammatory" suggestion in opening statement, the failure to suppress evidence, the admission of photographs, the failure to grant his motion to acquit and sentencing. In short he claims that the State's mistakes began before the trial and ended after conviction.

Factually the most difficult complaint relates to the seizure of what the prosecutor later regretted having termed "the largest cache of stolen goods in Baltimore City." [1] The evidence was seized from two buildings, 4016 and 4020 Lombard Street.[2] Louis Comi admittedly resided at least part time in 4016, and while his son owned 4020, the evidence provides no further link between appellant and 4020.

The evidence was seized on the strength of two search warrants. On February 15, 1973 warrant #1 was issued authorizing a search of 4016 Lombard. Upon that search, the officers discovered that 4016 and 4020 were two separate buildings. On February 16, 1973, the police applied for and received a warrant to search 4020 which authorized as well their return to 4016. Thus warrant #1 is as the horseshoe nail for which a kingdom was lost, since warrant #2 was largely founded upon information obtained during the execution of warrant #1. It follows that unless the information in warrant #1 amounted to probable cause and complied with the requirements of *Aguilar v. Texas*, 378 U. S. 108 both warrants must fall. On the other side of the coin however, the validity of #1 will not serve as a guarantee of the validity of #2.

## Search Warrant Number One

The affiant is a police officer eminently qualified by service in criminal investigation and extensive experience in

---

1. We treat the issue arising from the prosecutor's opening statement *infra*.

2. We shall depict as 4016 Lombard Street what was originally two row-type buildings known as 4016 and 4018. They were joined by reconstruction and made one large building operating in part as a pool parlor, with a single common entrance. 4020 was immediately appurtenant to, but had no entrance from, 4016. To go from one to the other it was necessary to leave one building and enter the other by an outside door.

search and seizure. He recites information received from an unidentified confidential informant who had provided the affiant "with accurate information in the past three months that had led to the recovery of approximately $300.00 worth of stolen property and the arrest of three people for burglary." The three had not as yet been tried. Furthermore, the police officer knew personally that his informant had given truthful and accurate information to other officers though it had not as yet culminated in an arrest.

We note from the hearing transcript that appellant's first counsel conceded that the informant was "credible or reliable." *Aguilar v. Texas*, 378 U. S. 108, 114. Though that concession would seem to preclude appellant's attack on credibility here, we find in any case that the affidavit fit within the "pattern . . . derived from the cases cited . . ." in *State v. Kraft*, 269 Md. 583, 614-615 and adequately established credibility.

The Court of Appeals pointed out in *Kraft, supra,* that there was no requirement to assert convictions from the arrests reasoning that it could be assumed that a prudent officer would not mislead the court by swearing to an arrest that had resulted in acquittal. Further we can equate affiant's personal knowledge of the truthful and accurate information given by the informant to other officers, with a *Kraft* example of one who was described as having on "repeated occasions in the past furnished reliable and credible information," citing *United States v. Rich*, 407 F.2d 934. The affidavit far exceeded that of *State v. Perry*, 59 N. J. 383, cited by *Kraft* with approval, 269 Md. at 611.

If further verification of the informant's credibility were required, it was found when the affiant independently corroborated certain of the information given him by the informant. *Spinelli v. United States*, 393 U. S. 410, 415; *Stanley v. State*, 19 Md. App. 507, 529.

The adequacy of the informant's "basis of knowledge," the second *Aguilar* prong, is not as clear cut as was his "credibility." The informant related in great detail that at about 11:00 p.m. on February 14, 1973 Larry Boardwine, whom he described, met with Gene Comi, from whom he

received $100 in exchange for several pieces of property. The affidavit says "they" then went to 4016 E. Lombard Street. We know "they" included Boardwine but cannot determine whether it also included the informant. In any event, the goods were delivered to Louis Comi at the above address.

The informant next named four persons, whom he described, as responsible for the theft of the described items of property from a private residence in Howard County the same day. The informant concluded by saying that one of the burglary participants, Gary Jacob Huster, "related to him/her" that the burglars had stolen stereo speakers from the house, but decided to leave the stereo components behind because they "got frightened." He further related that they had proceeded to Larry Boardwine's house immediately after the burglary. Although this latter information is inartfully expressed, we infer the informant's suggestion that the burglary was within a few hours of the Boardwine sale of goods to Gene Comi at 11:00 p.m., which, in February, would have been after dark.

The affiant contacted a State Trooper in Howard County who told him that there had been a residential burglary on the day in question, during which items precisely matching five of the six items allegedly sold to Comi were taken. Burned paper matches were found, indicating that the burglary was at night, and although two stereo speakers were stolen, the components were not. The complaint report was attached to and incorporated into the affidavit.

The "basis of knowledge" prong of *Aguilar*, 378 U. S. at 113, serves to insure that the information included originated as personal knowledge. At no point in this affidavit are we told that the informant "saw" or "heard" or participated in the activities described, the kind of assurance *Aguilar* prescribes. *Spinelli*, however, in its explication of the *Aguilar* requirements, permitted the "self-verifying detail" alternative for establishing an informant's basis of knowledge. 393 U. S. at 416-417. In the description of the delivery of goods to Gene and Louis Comi the informant provides such detail — including brand names, colors, the name of the cafe, time, the amount and form of payment —

that we may safely conclude that he spoke from personal knowledge.

The remainder of his story, however, suggests that he was told about the burglary by one of its participants, Gary Jacob Huster. We have held that a chain of informants may serve as the basis of a valid search warrant, but that each informant in the chain must meet the *Aguilar-Spinelli* requirements. *Thompson v. State*, 16 Md. App. 560.

In assessing the credibility of the secondary informant, we note first that he was named in the affidavit:

> "The confidential source further stated that Gary Jacob Huster related to him/her that . . . ."

As we have previously observed:

> ". . . in dealing with a named source, the very naming of the source and the relationship of the source to the observed information may go a long way (or even be sufficient unto itself) under the facts of a particular case, to establish the credibility of that source or the reliability of his information." *Dawson v. State*, 11 Md. App. 694, 699.

In addition to the source being named, his information was, to some extent, buttressed by the affiant's independent verification of the Howard County burglary, particularly the revelations concerning burned matches and stereo components. *Watson v. State*, 18 Md. App. 184, 193.

Even if "credibility" were not adequately established by the foregoing (we think it is), the underlying circumstances of his recitation suggest that his information was reliable. Credibility and reliability are alternative methods of establishing the veracity prong of *Aguilar, Thompson v. State*, 16 Md. App. 560, 562-563. The secondary source here was not a paid police informer, nor promised any sort of inducement to speak. In fact, he had no way of knowing his information would eventually arrive at police headquarters. He was merely relating an occurrence to a friend. We conclude that Huster had no motive to lie and his

information was conveyed in circumstances consistent with its reliability.

The secondary informant's "basis of knowledge" was obviously established by his admitted participation in the burglary. *Aguilar*, 378 U. S. at 113.

The requisite tests having been met, the combination of direct and hearsay information in this affidavit was properly relied upon in the determination of probable cause. *Dawson v. State*, 11 Md. App. 694, 697. We hold that those facts were sufficient to establish probable cause in that they were:

> ". . . such as to justify a prudent and cautious man in believing that the offense has been committed." *Dean v. State*, 205 Md. 274, 284.

### Execution

The warrant was executed and the search revealed a vertible warehouse of coins, jewelry, cameras and appliances in the cellar of 4016. To the chagrin of the police they were unable to locate the items whose seizure the warrant commanded, all of which had been stolen from the Howard County home. In plain view, however, they saw and seized Hash pipes and narcotic syringes, arguably if not clearly contraband, and seizable as such. *Hughes v. State*, 14 Md. App. 497, 511. They also wrote down the serial number of one of several television sets, and seized a rifle which was not among the items listed in the search warrant. Without deciding whether at that point in the investigation the sheer quantity of goods observed, coupled with other police knowledge of the occupants' activities provided probable cause to believe the rifle stolen, *Anglin v. State*, 1 Md. App. 85, we will assume the rifle was illegally seized as outside the scope of the warrant, *Hughes*, 14 Md. App. at 510. Its suppression does not alter our position on the validity of the second warrant.

### Search Warrant Number Two

Appellant argues primarily that the second search

warrant is bad either because it relies on an invalid first warrant, or because it relies on illegal seizures during the execution of the first warrant. The first alternative is nullified by our foregoing conclusion as to search warrant #1.

The second warrant affidavit incorporated the first by reference, and requested authority to search 4020 E. Lombard Street for the same items the police had unsuccessfully sought at 4016. This was because the officers did not discover that the pool room at 4016 E. Lombard Street was really two separate buildings, 4016 and 4020, until they executed the first warrant.

In addition, the second warrant recited that the rifle and television serial number had been seized, that the affiant had discovered that those items had been stolen in a Montgomery County burglary (the complaint report was attached), and described the tremendous volume of items the officers had observed during their first visit to 4016. The affiant then listed all of the items taken in the aforementioned Montgomery County burglary and sought authority to seize them from 4016.

We need not consider the warrant affidavit as it relates to 4020 since we hereafter decide that 4020 was inadequately linked to appellant. As to 4016, however, the affidavit was clearly adequate. The television set serial number had been in plain view at 4016 during the officer's first visit, and had been seen by virtue of a prior valid intrusion, *viz.* the first warrant. Its seizure was permissible under the plain view doctrine, *Coolidge v. New Hampshire,* 403 U. S. 443; *Brown v. State,* 15 Md. App. 584. The attachment of the Montgomery County police report listing the television as stolen consummated the probable cause equation. This is true notwithstanding our assumed illegality of the rifle seizure. The information regarding the television was an adequate basis, independent of and untainted by the rifle seizure, to support the second warrant:

> "If an affidavit for a search and seizure warrant contains improper information which should not be

considered by the court [in issuing the warrant] the court is nonetheless justified in issuing the warrant if additionally the affidavit contains within it sufficient proper information to show the existence of probable cause." *Carter v. State*, #51, Sept. Term, 1974, (Court of Appeals, filed April 11, 1975).

## Execution of Number Two

When the officers arrived at 4016 E. Lombard Street the second time they seized items they knew to be fruits of the Montgomery County burglary as well as a tremendous number of other items including jewelry, stereos, television sets, cameras, silver, fur coats, coins, guns, etc. Appellant argues that all but the items specifically described in the warrant should be suppressed as outside the scope of the warrant's mandate.

In analyzing the validity of the seizures we must keep in mind that the officers knew the items from the Montgomery County complaint report were in fact stolen. Furthermore, many of the other items they observed were engraved or monogrammed with names and initials of persons with no ostensible relation to the Comi family. Perhaps most unexplainable was the presence of literally truckloads of goods in a poolroom. On this latter point, in a case strikingly similar to the case at bar, *Anglin, supra*, 1 Md. App. 85, we held that the officers do not have to "know" the goods are stolen to seize them, rather need only have "reasonable cause" to believe they are. Judge Orth's words in *Anglin*, 1 Md. App. at 91 are most appropriate here:

> "With this knowledge and confronted with the great array of merchandise, literally enough to stock a store, we do not feel that justice requires the police officers to close their minds and eyes. We think there was more than reasonable cause for them to believe the property was stolen."

The seizures under warrant number two were valid.

## Motion for Judgment of Acquittal

Appellant contends that because there was no evidence of dominion or control of the 4020 premises by Louis Comi no inference of possession or receipt of stolen goods found there may be ascribed to him. As previously indicated, with this contention we find no fault. He projects his reasoning, however, to a point beyond which we are willing to go. He reasons that:

> "the goods seized from the premises of 4020 Lombard Street were not distinguished from the goods seized from the premises of 4016-18 East Lombard Street, so that a reasonable doubt can be said to exist with respect to the particular goods and properties that were seized from the respective locations; and accordingly, the confusion of properties, the locations from which they were seized precludes a verdict of Guilty on any of the property introduced into evidence."

The State had prosecuted appellant on 14 different counts, each of which asserted that Louis Comi had received goods stolen from an identified household. The State then collated the stolen goods into 14 separate groups corresponding to the persons from whom taken as indicated in the 14 counts. A schematic drawing was prepared and as the seizing officers testified they were asked the location where each group of goods had been found. As the witness identified the locations of the seizures, the name of the person(s) from whom the goods had been stolen was written on the drawing. Our own review included an item by item check, the result of which shows that only one count was based solely on a seizure from 4020 — a silver bowl which had been stolen from a Mr. Rosenstein — and it was upon that charging document only, Criminal Information No. 27400751, that the jury returned a not guilty verdict. On every other charge some of the stolen goods had been found in 4016. Thus, though we agree that 4020 was inadequately linked to Louis Comi and his motion for judgment of acquittal should have been granted as to Criminal Information No. 27400751, the error of the court

was corrected by the verdict of the jury. Appellant was in no way harmed. Appellant's bald allegation "that the goods seized from the premises of 4020 East Lombard Street were not distinguished from the goods seized from the premises of 4016-18 East Lombard Street . . ." is simply inaccurate. If appellant did not understand it, the record reflects it. If the judge overlooked it, the jury obviously did not.

## Separate Trials and Thirteen Sentences

We dismiss peremptorily appellant's contention without citation that the court erred in imposing thirteen separate sentences. Being within the statutory maximums they are not subject to review on appeal. *Powell v. State*, 1 Md. App. 495, 499. Because the charging documents were all amended to recite the same date for each offense detracts not a whit from the evidence produced from the victims of the thefts that the goods were stolen on different dates. The jury could properly infer from that evidence that the goods were received on different dates so long as the thefts preceded the date appellant was charged with receiving the goods.

The reasoning to support appellant's contention that the denial of his motion for separate trials of the offenses charged, fails to comport with the reasoning behind his complaint of separate sentences; however, we are given no more difficulty in answering the one than the other.

Whether or not to order separate trials is a matter within the sound discretion of the trial court, *Baumgartner v. State*, 21 Md. App. 251, 253; *Jennings v. State*, 8 Md. App. 312, 315. That much is acknowledged by appellant. He then fails to point to anything indicating an abuse of that discretion, save an allegation of confusion by the amount of stolen goods and the number of people from whom it was stolen. The perceptiveness of the jurors in parcelling out from whence the items were seized in each case, as we have indicated above, belies the argument of their confusion. The trial judge's discretion was not abused. Indeed, had fourteen separate trials been granted possibly before fourteen separate sentencing judges, the likelihood of concurrent

sentences might well have been diminished to appellant's misfortune.

### Admission of Photographs

Appellant asks:

"Did the Court err in admitting photographs of alleged stolen property which photographs contained pictures of some goods which were seized from the premises that were not under the control of the accused and without any legal sufficient evidence to establish that the accused had ever exercised any dominion, control or possession over such stolen goods? "

Appellant's entire argument is again without authority and again assigns prejudice without basis:

"Several of the photographs [3] admitted into evidence over the objection of the Appellant contained pictures of goods that were identified as stolen, which goods were seized from the premises of 4020 East Lombard Street and 431 Ellwood Avenue. The evidence clearly shows that the accused exercised no dominion or control over either of the premises at 4020 East Lombard Street or 431 Ellwood Avenue, and there was no evidence to demonstrate that he ever possessed or controlled any of the goods seized from said premises. It is the contention of the Appellant that the admission of photographs containing pictures of such goods constituted prejudicial error which warrants a reversal of the verdict in this case."

Our response is as brief as is appellant's argument. We are able to perceive no prejudice. To the contrary, we once more note that the verdict showed a careful and discriminating

---

3. Some of the photographs admitted were taken at the police station where the goods had been sorted into piles relating to the place from whence they had been stolen. Appellant's complaint is that by so doing the goods taken from the various locations were intermingled.

analysis by the jury indicating the very opposite of what appellant implies.

### The Largest Cache of Stolen Goods in Baltimore City

We are less comfortable with the possible prejudice that might have arisen from the remark of the State's Attorney in opening statement that the case before the court involved "the largest cache of stolen goods in Baltimore City." Equal concern was expressed by the trial court upon timely objection by appellant, indicating that it would grant a mistrial if it decided the statement was "not a genuine issue." The judge then deferred ruling on the issue. The first day of trial ended with the conclusion of the State's opening statement.

The following day after court convened but before appellant offered his opening statement the court addressed the jury:

> "Members of the jury, in the opening statement made to you yesterday by the Assistant State's Attorney, Mr. Tully, an improper remark was made to you with regard to something along the line that this was the largest cache of stolen goods in the history of the City of Baltimore. And you will remember there was an objection to that statement. You will also remember from your orientation charge and from your service as jurors in this courthouse during this term, that the proper function of an opening statement is to prove to you, not prove to you, but is to outline for you what will be proven as part of each party's case. The statement I've just alluded to is not and could not strictly be proven to you in this case, because it's improper and irrelevant evidence. Therefore, any mention of such an item in the opening statement was improper. You are directed to disregard that statement, and I am going to admonish the State's Attorney that there will be no further remarks

along that line. And furthermore, that, as he understands from our discussion in chambers, that this was improper in his opening statement. Mr. Tully."

Whereupon being recognized by the court, the State's Attorney profusely apologized to court and jury:

"Yes, Your Honor. Your Honor, I would like to point out to the Court and to the jury it was inadvertance and I realize what the Judge had referred me to the law last night that it was improper, and I so apologize to the jury for bringing it up, and apologize to this Court and members of this Court for bringing it up; pointing out again it was inadvertent, I did not realize that I was stepping beyond the ramifications of this trial."

The court then denied the motion for a mistrial:

"Gentlemen, in the course of the opening statement, a remark that I've just alluded to in front of the jury was made and a motion for mistrial was made by the defense."

The applicable law was succinctly stated by Judge O'Donnell in *Wilhelm v. State*, 272 Md. 404, 411-412:

"The primary purpose or office of an opening statement in a criminal prosecution is to apprise with reasonable succinctness the trier of facts of the questions involved and what the State or the defense expects to prove so as to prepare the trier of facts for the evidence to be adduced. While the prosecutor should be allowed a reasonable latitude in his opening statement he should be confined to statements based on facts that can be proved and his opening statement should not include reference to facts which are plainly inadmissible and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. An opening statement by counsel is not evidence and

generally has no binding force or effect. To secure a reversal based on an opening statement the accused is usually required to establish bad faith on the part of the prosecutor in the statement of what the prosecutor expects to prove or establish substantial prejudice resulting therefrom. *Clarke v. State*, 238 Md. 11, 19-20, 207 A. 2d 456, 460 (1965); *Ott v. State*, 11 Md. App. 259, 266, 273 A. 2d 630, 634, *cert. denied*, 262 Md. 748 (1971)."

Had the State described the size of the cache in comparative rather than superlative degree there would not even have been need for sustaining an objection in light of the facts proved. In consideration of the thorough and adequate instruction given by the judge, the State's abject public admission of error, and the humiliation emanating from a public apology, we can hardly say that the use of the superlative was prejudice.

In a 1907 case involving a remarkably similar situation the Court of Appeals eloquently reached the same conclusion we have:

"This remark was objected to as improper, and the Court in the presence of the jury told the State's Attorney that it was not proper for him to make that statement. The State's officer then apologized for making it and promptly withdrew the objectionable statement. It is not to be presumed that a body of competent and honest men, sworn to try the issue of the traverse upon the evidence produced before them, would permit the statement to influence their finding, after the Court had pronounced it to be improper, and after it had been withdrawn from their consideration." *Esterline v. State*, 105 Md. 629, 637.

In the absence of any evidence of "bad faith," the remark was clearly not ground for mistrial.

*Judgments affirmed.*
*Costs to be paid by appellant.*